148 Ariz. 343 (1985)
714 P.2d 836
CORTARO WATER USERS' ASSOCIATION, an Arizona non-profit corporation, and Cortaro-Marana Irrigation District, Pima County, Arizona, a political subdivision of the State of Arizona, Plaintiffs-Appellants-Appellees,
v.
Wesley E. STEINER, Director of the Department of Water Resources; the Department of Water Resources, an agency of the State of Arizona; the State of Arizona; City of Tucson, a political subdivision of the State of Arizona, Defendants-Appellants-Appellees, and Lewis McGinnis, a beneficial owner under Transamerica Title Insurance Company, Trust Nos. 82-28 and 82-29; Jackson-McGinnis Industrial Properties, an Arizona Joint Venture as beneficial owner under a Fidelity National Title Trust Company, Trust No. 10,066; Transamerica Title Insurance Company, as Trustee; and Fidelity National Trust Company, as Trustee, Intervenors-Appellees.
Nos. 1 CA-CIV 7513, 1 CA-CIV 7514 and 1 CA-CIV 7515.
Court of Appeals of Arizona, Division 1, Department A.
April 16, 1985.
*344 Martinez & Curtis, P.C. by Michael A. Curtis, Jay M. Martinez, William P. Sullivan, Phoenix, for Cortaro.
Bill Stephens, P.C. by Bill Stephens, Phoenix, for City of Tucson.
State of Ariz., Dept. of Water Resources by Kathleen Ferris, Chief Counsel, Scott Larmore, Deputy Counsel, Phoenix, for Dept. of Water Resources and Wesley E. Steiner, Director of the Dept. of Water Resources.
Roger D. Weissman, Tucson, for Lewis McGinnis, Jackson-McGinnis Indus. Properties, Transamerica Title Ins. Co., and Fidelity Nat. Trust Co.
*345 OPINION
FROEB, Presiding Judge.
The 1980 Arizona Groundwater Management Act may well be the most ambitious legislation ever enacted by the Arizona Legislature and the most comprehensive water code in the United States.[1] This case involves an interpretation of one aspect of the code referred to as "service area rights" and is the first Arizona appellate opinion to do so. The decision also involves several other issues concerning administrative review and attorney fees.
The case arose from administrative proceedings before the Arizona Department of Water Resources, an agency created by the code, which has been given broad powers to administer water legislation in Arizona. The proceedings were initiated by the City of Tucson to acquire permits to drill three new water wells in a developing area outside of Tucson. The area under development, referred to here as Peppertree Ranch, lies, in part, within the legal boundary of the Cortaro-Marana Irrigation District. Since the water district has established rights to groundwater in this geologic basin, the association which administers the district opposed the well permits and later brought suit in Maricopa County Superior Court. It is from the resulting judgment that this appeal is before us.
The key ruling of the case, necessarily generalized and reduced to its essence, is that a city may not go outside its existing service area in order to drill new wells for the purpose of serving new customers. This is not to say that a city cannot extend its water service to new customers. The groundwater code provides certain avenues for this, but in this decision we do not discuss those avenues because they are not at issue before us.
We turn first to a short discussion of terminology used in the water code and in this decision.
Active Management Area
Although it is not our purpose to review the conceptual underpinnings of the groundwater code, the concept of "active management area" (AMA) in the code deserves short mention. An AMA is a critical groundwater area in Arizona. Four areas were designated in the code itself, but there are provisions for adding others. The four existing areas are Tucson, Phoenix, Prescott and Pinal. Withdrawal of water in an AMA is subject to close regulation, whereas a less restrictive set of statutory provisions applies to areas outside of active management areas. This case deals solely with withdrawal of groundwater in an AMA.
In order to initiate a new residential development in an AMA, there must be an assured supply of water for at least one hundred years. A.R.S. § 45-576.
Service Area Rights
In an AMA, a city has the right to withdraw and transport groundwater within its "service area" for the benefit of landowners and residents within its "service area." A.R.S. § 45-492.[2]
"Service area" is defined in A.R.S. § 45-402(25).[3] It means "[w]ith respect to a city ... the area of land actually being served water" by the city plus "[a]dditions to such area which contain an operating distribution system owned by the city or town *346 primarily for the delivery of non-irrigation water."
In this case, the well permits sought by Tucson hinge on what is meant by the "additions to" language of A.R.S. § 45-402(25), just quoted. We discuss this later in the opinion.
Right of City to Withdraw Groundwater
In an AMA, a city has the right "to withdraw and transport groundwater within its service area for the benefit of landowners and residents within its service area," subject to various requirements of A.R.S. § 45-492. (Emphasis added) There are some additional limitations. See, for example, A.R.S. § 45-493.

The Administrative Proceedings before the Department of Water Resources
On October 30, 1980, the City of Tucson (Tucson) filed applications, pursuant to A.R.S. §§ 45-598 and 45-599, with the Department of Water Resources (Department) to drill three new wells (designated by the Department as Q55-86156, Q55-86157, and Q55-86158). The new sites are located in the Upper Santa Cruz sub-basin of the Tucson Active Management Area within a proposed residential and industrial development known as Peppertree Ranch, consisting of approximately 2,800 acres. Tucson based its entitlement to the well permits on its service area rights under A.R.S. § 45-492. At the time of application for the permits, Tucson was not serving Peppertree Ranch with water, nor did Peppertree contain an operating distribution system owned by Tucson primarily for the delivery of non-irrigation water.
The Department ordered a public hearing in accordance with A.R.S. §§ 45-105(A)(10) and 41-1009. A hearing was held over the course of five months in 1981 in which Cortaro opposed Tucson's claim to the permits. Testimony at the hearing indicated that Peppertree Ranch was situated on part of Cortaro's well fields and that Cortaro had offered to serve domestic water to Peppertree Ranch.
During the proceedings, Cortaro filed a complaint and request for a cease and desist order. Cortaro alleged that Tucson was pumping or about to commence pumping groundwater from an existing well within the boundaries of Peppertree Ranch which Tucson had acquired by a quitclaim deed. Cortaro maintained, however, that this well belonged to it by reason of an earlier deed to Cortaro Water Users' Association. Cortaro prayed for a cease and desist order to stop withdrawal of water from the existing well because the well was outside Tucson's service area, or alternatively because use of the well by Tucson would constitute an "attempt by the City to illegally expand its service area under A.R.S. § 45-493." The cease and desist order was also sought to prevent the construction and operation of a water distribution and supply system and to prevent the pumping of any additional water in violation of the deed held by Cortaro.
On March 25, 1982, the Department issued a decision in the case granting the requested well permits. Peppertree was found to be part of Tucson's "service area" as provided by A.R.S. § 45-492. The Department concluded that A.R.S. §§ 45-402, 45-492, 45-493, 45-576 and 45-598, together with all other provisions of the groundwater code, indicated an intent to allow a city to expand its service area and locate wells in new developments not previously served by the city. The Department concluded that when there is a showing that an assured water supply exists to serve the new area for at least one hundred years and expansion to the area would not be contrary to the limitations found in A.R.S. § 45-493, and the proposed wells would not unreasonably increase damage to surrounding land or other water users from the concentration of wells pursuant to A.R.S. § 45-598(A), then a city may locate new wells in the proposed development consistent with its service area rights. After applying this code interpretation to the facts of this case, the Department concluded that factually all the statutory prerequisites necessary to issue well permits existed. *347 The permits were issued subject to three specific conditions relating to the operation of the wells. The decision did not expressly grant or refuse the requested cease and desist order sought by Cortaro.
In its motion for rehearing, Tucson alleged that two of the conditions set forth in the Department's order exceeded the Department's authority and were inconsistent with the Department's findings of fact and conclusions of law. The motion for rehearing filed by Cortaro Water Users' Association and Cortaro-Marana Irrigation District (Cortaro) sought reversal of the Department's decision to issue the well permits and asked that Peppertree be found to be a part of Cortaro's service area.
The Proceedings before the Superior Court
On July 6, 1982, Tucson filed a complaint in the superior court against the Department and Cortaro pursuant to A.R.S. §§ 45-405 and 45-406 of the groundwater code, and A.R.S. § 12-905 of the Administrative Review Act. Tucson alleged that the Department had exceeded its statutory authority in imposing the three conditions attached to the well permits and that the Department had erroneously denied Tucson's request for a rehearing. This proceeding was later dismissed with prejudice at the request of Tucson.
Cortaro also filed a complaint (later amended) naming the Department and Tucson as defendants. In its first claim for relief, Cortaro prayed that the Department's decision issuing the well permits be set aside on the ground that Peppertree was outside the service area of Tucson. In its second claim for relief, Cortaro sought a preliminary injunction to restrain Tucson from "further withdrawal of groundwater of said existing irrigation well or any other wells located within the Peppertree Ranch area, and from constructing a water distribution and supply system in the Peppertree Ranch area...." In addition, attorney fees pursuant to A.R.S. § 12-348 and costs were requested.
Cortaro thereafter moved for partial summary judgment on grounds that the issuance of the three well permits was illegal as Peppertree was not a part of Tucson's service area and that the Department had failed to promulgate rules and regulations pursuant to A.R.S. § 45-598 prior to the issuance of the permits.
On March 7, 1983, the superior court found, by minute order that "[Cortaro has] appealed from the Department's decision issuing drilling permits to the City of Tucson for the drilling of three new wells on Peppertree Ranch. Plaintiffs have raised two issues by a pleading called Motion for Partial Summary Judgment. The parties and the court have treated the briefs and arguments on those issues as the appeal itself for those two legal issues." The court then held that the issuance of the well permits was a "legal nullity" since Peppertree was not part of Tucson's service area at the time the Department had issued the well permits and granted Cortaro's motion for partial summary judgment on the first ground urged. The court also granted Cortaro a "permanent injunction as prayed for...." Since the court disposed of Cortaro's appeal by finding that Peppertree was not part of Tucson's service area, it declined to rule on the Department's failure to promulgate rules and regulations as a ground for reversal.
Thereafter, on March 21, 1983, the Peppertree owners submitted a motion to intervene and an alternative motion to appear amicus curiae pursuant to rule 24, Arizona Rules of Civil Procedure. Peppertree sought to intervene only with respect to Cortaro's claim for an injunction. Peppertree sought to appear as amicus curiae on the service area issue.
On June 2, 1983, the superior court entered an interlocutory judgment and granted Peppertree's motion to intervene. However, the court reversed itself on the issue of the injunction and found that:
The court is further persuaded that an original injunction cannot be granted by this court in the present proceeding (except *348 as might become necessary to enforce its ruling relative to the administrative appeal) because the claim for an injunction is improperly joined with an administrative appeal, because administrative remedies have not been exhausted, and because the claim for injunction fails to name indispensable parties. Accordingly, it is further ordered granting intervenors' motion to dismiss Count II of [Cortaro's] complaint without prejudice.
As for the three well permits, the trial court adhered to its previous ruling that the well permits were a legal nullity. The case was remanded to the Arizona Department of Water Resources "with instructions to cancel and revoke the three well drilling permits."
The superior court entered judgment on September 29, 1983, in which it denied Cortaro's motion to strike the affidavit of Stephen E. Davis, (one of Tucson's witnesses who, in his affidavit, related events that occurred after Tucson's application for the well permits); denied Cortaro's application for attorney fees; awarded costs and incorporated the June 2, 1983, interlocutory judgment.
Last, on November 9, 1983, the superior court denied Cortaro's motion for new trial and awarded Cortaro $1,922.76 in costs against the Department. All other motions, objections or requests were denied.
The Present Appeal
Cortaro, the Department, Tucson and intervenors (Peppertree) each timely appealed from the judgment. Peppertree's appeal was later dismissed by order of this court because Peppertree was not a party aggrieved by the judgment as required by rule 1, Arizona Rules of Civil Appellate Procedure.
I.

Was Tucson entitled to permits to drill three new wells at the Peppertree Ranch?
Tucson was issued the three permits by the Department after administrative proceedings described earlier. Following reversal in the trial court, Tucson and the Department argue that the Department correctly interpreted the groundwater code in allowing the permits. Their interpretation is based upon the concept that a city does not need to be serving an area with water in order to obtain permits to drill wells. They look beyond A.R.S. § 45-492 which states that the right to withdraw and transport groundwater is tied to existing service areas, as well as the definition of service area in A.R.S. § 45-402(25). Tucson and the Department contend that drilling permits for water outside of the existing service area are authorized by other statutory provisions dealing with well permits in general (A.R.S. §§ 45-598, 45-599 and 45-493) and with those that require a subdivider of land to obtain a certificate of assured water supply (A.R.S. § 45-576).
In essence, Tucson and the Department argue that within an AMA, if a city demonstrates an assured supply of water for at least one hundred years (which Tucson did to the satisfaction of the Department in this case) then it is eligible for well drilling permits as any other applicant under A.R.S. § 45-599. As for being limited to existing service areas, Tucson and the Department argue the legislature could not have meant this in the groundwater code, because to do so would severely limit the growth of cities in Arizona.
Cortaro takes the position that a city may only seek well permits in its existing service area as that term is defined in A.R.S. § 45-402(25). Although that definition includes added areas which have an "operating distribution system", Cortaro argues that even in added areas which might be connected by pipe to the city water system, the added area must have water flowing through its "operating distribution system" before it can be made a part of the "service area" of the city. Under this view, a new area cannot be added to a city's existing service area by merely extending the distribution system by laying pipes; there must be water passing *349 through the pipes before it can be considered an addition to the existing service area.
All parties argue the meaning of statutory provisions in the groundwater code beyond that which is necessary for our decision. We are aware that the code was the product of compromise in the legislature and that it represents a balancing of the rights of three important interests in Arizona: mining, agriculture and municipalities. It is comprehensive and detailed. It deals with a subject that is as technical as it is political. We look first to the plain meaning of its language before searching elsewhere to find the legislative intent.
The subject of new and existing wells is set forth in A.R.S. §§ 45-591 to 45-604. A person may construct, replace or deepen a well in Arizona only in accordance with these provisions. A.R.S. § 45-592. A city entitled to withdraw groundwater in an AMA may apply for well permits from the director of the Department of Water Resources. See A.R.S. §§ 45-598 and 45-599. As a predicate for the application, the city must show that the water sought to be pumped is within its "service area" for the benefit of landowners and residents within the "service area". We reach this conclusion from the language of A.R.S. § 45-598(B) which requires, at the threshold, that the city be entitled to groundwater pursuant to A.R.S. § 45-492 (A.R.S. § 45-598(B) refers to "Article 6" and the controlling provision of Article 6 for this issue is A.R.S. § 45-492).
Since the permits in this case stand or fall on whether the proposed wells are located in Tucson's service area, the issue depends upon whether Peppertree Ranch is within the service area defined in A.R.S. § 45-402(25) (earlier quoted). For it to be such, Tucson must either have been actually serving water to Peppertree Ranch at the time it applied for the well permits or Peppertree Ranch must have contained an operating distribution system owned by Tucson. At the time it applied, Tucson had not fulfilled either requirement.
As for the meaning of the term "operating distribution system," we do not need to reach an interpretation of the phrase, because Tucson owned no distribution system at all at the Peppertree Ranch. Thus the argument presented by the parties on appeal concerning whether the term "operating" means that water must be actually flowing through the system or whether it means the system need only be ready for water is not reached in this case.
In conclusion, we hold that the trial court correctly ruled that well permits were erroneously issued by the Department. It is therefore not necessary to consider the alternative argument presented by Cortaro relating to rules. Cortaro's argument that the well permits are invalid because the Department had not promulgated rules for issuance of well permits pursuant to A.R.S. § 45-598(A) must await another day.
II.

Was dismissal of Count II of Cortaro's amended complaint proper?
On July 24, 1981, Cortaro submitted a complaint and request for a cease and desist order to the Department. Cortaro prayed that Tucson be ordered to cease and desist from three activities: the withdrawal and distribution of water from Tucson's existing well at Peppertree; the construction and operation of a "water distribution and supply system" until the service area dispute was resolved; and the pumping of water by Tucson in violation of a deed to Cortaro giving it the right to all "percolating water underlying the boundaries of the Cortaro Water Users' Association" including Tucson's existing well at Peppertree.
The Department responded to Cortaro's request in a letter dated October 1, 1981, by W. Don Maughan, deputy director of the Department. In the letter, Maughan stated that
[t]he [groundwater] Code does not provide that a water user may compel the Department to hold an enforcement hearing. While the Department investigates every complaint it receives, it is not required *350 to issue a formal order on any such complaint.
* * * * * *
The Department is concerned that a separate cease and desist hearing on Tucson's withdrawals from an existing well in the Peppertree Ranch area would conflict with the hearing currently taking place. Rather than expedite the determination of the City of Tucson's service area, a separate cease and desist hearing could significantly delay the resolution of this issue.
I believe it is in the best interest of all concerned to resolve the service area issue in the context of the hearing currently taking place at the Department.
On March 25, 1982, the Department issued its Decision and Order. The order did not mention Cortaro's requested cease and desist order, but did refer to the existing well owned by Tucson at Peppertree. The Department noted in its findings of fact that Tucson had acquired by quitclaim deed from the owners of Peppertree "an existing irrigation well"; the Department drew a conclusion as to the "total effect of all four wells" [the three requested wells plus the existing well] on water levels in the area; and the Department stated that Tucson's operation of the three new wells and the one existing well would not "unreasonably increase damage to the surrounding land or other water users...."
More importantly, however, the Department summarized the issues before it as follows:
1. Would the wells the City of Tucson proposes to drill unreasonably increase damage to surrounding land on other water users from the concentration of wells?
2. Would granting the three permits to the City of Tucson be in accordance with the general objectives of the Groundwater Management Code ... and [be] reasonably consistent with the several provisions pertaining to city service areas? (Emphasis added.)
No mention is made of an issue concerning the withdrawal of groundwater by Tucson at its existing well or of the other two activities included in Cortaro's request for a cease and desist order.
As discussed earlier, Cortaro sought a preliminary injunction from the superior court to halt Tucson from withdrawing water from any well at Peppertree. Cortaro also asked that Tucson be prevented from constructing a water distribution and supply system at Peppertree. The superior court ordered that a "permanent injunction as prayed for should issue...."
As a result of the injunction, the Peppertree owners moved to intervene pursuant to rule 24, Arizona Rules of Civil Procedure. In addition, they moved to appear as amicus curiae in regard to the "service area" issue. Peppertree also moved to dismiss Count II of Cortaro's amended complaint, seeking the injunction, based on three grounds: (1) Cortaro's impermissible joinder of additional claims for relief on the same action with an administrative appeal; (2) failure by Cortaro to exhaust administrative remedies; and (3) failure to join Peppertree as an indispensable party pursuant to rule 19, Arizona Rules of Civil Procedure, both at the administrative level when it requested a cease and desist order and at the superior court level when it requested an injunction.
On June 2, 1983, the superior court issued its decision and interlocutory judgment. The court granted Peppertree's motion to intervene. It then held that its prior order granting the injunction was incorrect:
The court is further persuaded that an original injunction cannot be granted by this court in the present proceeding ... because the claim for an injunction is improperly joined with an administrative appeal, because administrative remedies have not been exhausted, and because the claim for injunction fails to name indispensable parties.
Further, the court granted Peppertree's motion to dismiss Count II of Cortaro's complaint without prejudice.
*351 Cortaro now argues that the Department ordered a hearing to be held on Cortaro's requested cease and desist order as is shown by Maughan's October 1, 1981, letter. It argues the hearing was incorporated into the ongoing hearing concerning Tucson's requested well permits. According to Cortaro, the director's March 25, 1982, Decision and Order constituted the Department's final decision denying the requested cease and desist order which Cortaro then properly appealed to the superior court pursuant to A.R.S. § 45-634(C). Cortaro does not suggest whether the Department held a hearing on Cortaro's entire requested cease and desist order or only on a part of it.
The Department states that "for all intents and purposes" it treated the ongoing hearing concerning Tucson's requested well permits as a hearing also on Cortaro's request for a cease and desist order in regard to Tucson's existing well at Peppertree; that the final decision denied only that part of Cortaro's cease and desist request which dealt with the withdrawal of groundwater from Tucson's existing well at Peppertree; therefore, only this part of the denied cease and desist order is appealable, whereas, the injunction requested by Cortaro goes beyond that which was decided at the administrative level.
Tucson claims that the court properly dismissed Count II of Cortaro's amended complaint because Cortaro failed to exhaust administrative remedies and improperly presented the superior court with an original action when it sought the injunction.
We hold that the superior court properly dismissed Count II of Cortaro's amended complaint. "Under A.R.S. § 12-902 the scope of appeal in the Administrative Review Act is limited to the review of a final decision of an administrative agency ... A.R.S. § 12-901 defines a decision as a decision, order or determination of an administrative agency which terminates the proceeding before the agency ... (emphasis supplied)." Arizona Commission of Agriculture and Horticulture v. Jones, 91 Ariz. 18-3, 187, 370 P.2d 665, 668 (1962). See also A.R.S. §§ 12-904 and 12-905(A).
There is no question that Cortaro requested a cease and desist order on July 24, 1981. We disagree, however, with both Cortaro and the Department that the Maughan letter of October 1, 1981, ordered a cease and desist hearing to be incorporated into the ongoing hearing concerning Tucson's requested well permits.
The Maughan letter merely indicated that the Department was more concerned with resolving the service area issue than in conducting a cease and desist hearing pursuant to Cortaro's request. Further, no order was entered by the Department, pursuant to A.R.S. § 45-634, incorporating the cease and desist hearing with the well permit hearing. Also, none of the parties have directed the court to any portion of the record showing the parties believed that a cease and desist hearing was simultaneously being heard with the well permit hearing. In the Decision and Order of the Department, dated March 25, 1982, the question of the continued use of the existing well by Tucson remains conspicuously absent from the issues set forth by the Department in its order. The mere mention of the existing well at various points in the decision does not indicate to us that the Department included the matter for hearing and adjudication. Moreover, it is of considerable significance that Cortaro's motion to consolidate the cease and desist hearing with the well permit hearing was denied by the hearing officer on November 24, 1981, prior to the decision of the Department.
Whether the director of the Department of Water Resources chooses to order a hearing on a cease and desist request is within the director's discretion. A.R.S. § 45-634(A) and (B). Once a hearing has been ordered and held, however, the director shall issue a decision and order. A.R.S. § 45-634(C). It is this decision and order which constitutes the final action appealable to the superior court. A.R.S. § 45-634(C).
*352 We find that no hearing was ordered by the Department on the requested cease and desist order, either in its entirety or in any limited part. Therefore, the Department could not have issued a denial of the requested cease and desist order in its Decision and Order dated March 25, 1981. Consequently, no final ruling from which an appeal could be taken was issued by the Department pursuant to A.R.S. § 45-634(C). The superior court therefore properly dismissed Count II of Cortaro's amended complaint. We do not reach other arguments relating to this issue.
Cortaro also argues that the superior court "erred procedurally when it simultaneously granted intervention and granted the relief sought by the Peppertree Owners' Motion to Dismiss and Objections to Proposed Form of Order" in violation of rule 24, A.R.C.P. We note that Cortaro responded to the merits of Peppertree's motion to dismiss Count II of Cortaro's amended complaint with a 59-page motion in opposition to Peppertree's intervention approximately two months before the court ruled on the matter. The response also included argument on the propriety of Cortaro's requested injunction. Therefore, any procedural error by the superior court was harmless in this instance.
Last, Cortaro argues that Tucson and the Department cannot rely on the injunction arguments presented by Peppertree in the trial court. In other words, Cortaro argues that each party on appeal is restricted to presenting only those arguments which each individually presented to the superior court. The cases cited by Cortaro in support of this argument hold that issues not raised in pleadings or arguments before the trial court will not be heard on appeal; however, the arguments presented to this court were the same as those presented to the superior court. See Payne v. Payne, 12 Ariz. App. 434, 471 P.2d 319 (1970). The fact that Tucson may now have adopted those arguments used by Peppertree does not make them unavailable on appeal.
Cortaro has treated the matter of the injunction and Peppertree's intervention as related. It contends that if the grant of intervention is found to be improper then "the question of the Court's authority to issue an injunction also disappears, having been raised only by the Intervenors." We disagree. We hold that whether we find the intervention to be proper or not, our decision regarding the injunction would not be different. Since a determination of the intervention issue would not affect the injunction or any other issues in this appeal, we need not discuss it further.
III.

Is Cortaro entitled to attorney fees and expenses pursuant to A.R.S. § 12-348?
Cortaro appeals from the denial of its request for attorney fees and expenses in the approximate amount of $96,800.00. These fees were incurred by Cortaro in preparation for and participation in the Department hearings and in prosecuting its appeal before the superior court. Cortaro also seeks to recover attorney fees and expenses incurred by reason of this appeal. In making its claim, Cortaro relies upon the following provisions of A.R.S. § 12-348:
A. In addition to any costs which are awarded as prescribed by statute, a court shall award fees and other expenses to any party other than this state which prevails by an adjudication on the merits in any of the following:
* * * * * *
3. A court proceeding to review an agency decision pursuant to title 12, chapter 7, article 6 [A.R.S. § 12-901 et seq.], or any other statute authorizing judicial review of agency decisions.
* * * * * *
G. As used in this section:
1. "Fees and other expenses" includes the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test or project which is found by the court to be necessary for the preparation of the party's case and reasonable *353 and necessary attorney fees, and in the case of an action to review an agency decision pursuant to subsection A, paragraph 3, all such fees and other expenses incurred in the contested case proceedings in which the decision was rendered.[4] (Emphasis added.)
This language has been interpreted as mandatory in nature. See Tanner Companies v. Arizona State Land Department, 142 Ariz. 183, 688 P.2d 1075 (App. 1984). Thus, Cortaro contends this case is a review of an agency decision and that it is entitled to recover costs and attorney fees. The Department contends it is exempt from paying attorney fees pursuant to A.R.S. § 12-348(F). We turn to this contention first.
A. Is the Department exempt from liability for attorney fees and expenses pursuant to A.R.S. § 12-348(F)(1) or (4)?
The recovery of fees under A.R.S. § 12-348 is qualified by two of its subsections. A.R.S. § 12-348(B) provides for denial or reduction of fees under certain circumstances not applicable here. A.R.S. § 12-348(F) sets forth circumstances to which the statute does not apply in the first instance. Specifically, A.R.S. § 12-348(F) provides in part:
F. This section does not:
1. Apply to an action arising from a proceeding before this state in which the role of this state was to determine the eligibility or entitlement of an individual to a monetary benefit or its equivalent, or to adjudicate a dispute or issue between private parties or to establish or fix a rate.
* * * * * *
4. Apply to proceedings involving eminent domain, foreclosure, collection of judgment debts or proceedings in which the state is a nominal party. (Emphasis added.)
The Department argues that the availability of groundwater can be a major factor in a well permit applicant's decision to pursue or forego a business venture. From that premise, it contends that its decision to issue a well permit can be equated to a monetary benefit or its equivalent. In essence, the Department argues that, because its well permit decisions may have an economic impact, it comes within the exemption provision of A.R.S. § 12-348(F)(1). We disagree.
Any governmental action which tends to limit or regulate the right to use groundwater has an economic effect on property. See Town of Chino Valley v. City of Prescott, 131 Ariz. 78, 638 P.2d 1324 (1981). It is clear, however, that economic impact alone does not trigger the exemption contained in A.R.S. § 12-348(F)(1). The statute exempts proceedings where the applicant seeks payment of money or its equivalent from a government agency. That is clearly not the case here.
The Department next argues that it is a nominal party in well permit proceedings and is, therefore, exempt pursuant to A.R.S. § 12-348(F)(4). We hold that under the facts of this case, the Department was more than a nominal party.
The hearing which is the subject of this appeal was held pursuant to A.R.S. § 45-599(E). At the hearing, the Department acted not only as the decision-maker contemplated by the statute, it was also a vigorous proponent of the position eventually adopted. The Department presented evidence regarding the service area issue and the hydrological impact of the proposed wells. Additionally, the Department cross-examined witnesses and urged procedural motions. Clearly, the Department was more than a nominal party at the hearing.
Nor can it be said that the Department is a nominal party to this appeal or *354 the appeal taken before the superior court. When an agency decision is appealed, the agency must be made a party to the appeal. A.R.S. § 12-908. This is not just a formality. The agency is an indispensable party to a review of its decision as the review not only affects the rights of the aggrieved party, "but also how that decision may affect future administration by the [agency] in dealing with other[s] ... who are not before the court." Burrows v. Taylor, 129 Ariz. 212, 214, 630 P.2d 35, 37-38 (App. 1981). Accordingly, the Department is not exempt as a nominal party. See Rathjen v. Industrial Commission, 233 Wis. 452, 289 N.W. 618 (1940) (Industrial Commission not nominal party in action against employer and its insurors to set aside Industrial Commission award).
Finally, the Department seeks to classify the hearing proceedings as a dispute between private parties which the Department adjudicated. This would exempt the Department under § 12-348(F)(1).
Our previous discussion establishes that the hearing was more than a dispute between private parties. The Department, Tucson and Cortaro all actively participated in the proceedings concerning Tucson's requested well permits. Accordingly, this was not the adjudication of a dispute between private parties within the meaning of § 12-348(F)(1).
As the Department is not exempt from liability for attorney fees and expenses, we next discuss which of these fees and expenses Cortaro may recover.

B. Is Cortaro entitled to recover attorney fees and expenses incurred before the Department?

Before Cortaro may recover attorney fees and expenses incurred before the Department, it must prevail in a court review of the decision. A.R.S. § 12-348(A)(3). Further, it must have been a party in a "contested case" before the agency. A.R.S. § 12-348(G)(1) (quoted earlier).
"Contested case" is a specialized term used in connection with administrative proceedings. The term is defined in the Administrative Procedure Act, A.R.S. § 41-1001, as follows:
2. "Contested case" means any proceeding, including but not restricted to ratemaking, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing. (Emphasis added.)
Thus, the department proceedings were not a "contested case" unless an opportunity for a hearing was required before the matter could be determined by the agency.
These proceedings originated as an application for well drilling permits pursuant to A.R.S. §§ 45-598 and 45-599. Subsection E of § 45-599 provides that whether a hearing shall be held is within the discretion of the director. A hearing is not required, and even though a hearing was conducted in this instance at the discretion of the director, that did not make it a "contested case" within the meaning of A.R.S. §§ 41-1001 or 12-348(G)(1). In short, the Department was not "required" to hold this hearing, but in the discretion of the director a hearing was nevertheless held. Since this was not a "contested case," we hold that Cortaro may not recover its attorney fees and expenses incurred before the Department.
C. Is Cortaro entitled to recover attorney fees and expenses incurred in its appeal of the Department order to the superior court?
Turning to proceedings in superior court and in this court, § 12-348(A)(3) allows a prevailing party to recover fees incurred in the appeal of an agency decision. As for attorney fees and expenses on appeal, the statute does not require that the case have been a "contested case" at the administrative level. Both in the superior court and in this court, Cortaro is the successful party regarding the issuance of well permits, as well as the issues relating to the Davis affidavit and the remand (discussed later). It is not successful concerning issuance of the injunction and the necessity for findings of fact and conclusions of law (also discussed later). Nevertheless, *355 we find Cortaro is the prevailing party as to the case as a whole and is therefore entitled to recover fees and expenses, both in the superior court as well as in this court.
In lieu of remanding the issue of the amount of attorney fees to the superior court, we will hold that question for determination in this court at such time as a request for a specific amount of attorney fees on appeal is filed in this court pursuant to rule 21(c), Arizona Rules of Civil Appellate Procedure.

D. Did the superior court err by not making findings and conclusions regarding attorney fees?

Cortaro argues that the trial court was required to make findings regarding attorney fees pursuant to A.R.S. § 12-911(C) and to give its reasons for denying them. While it is true that prior to the ruling of the superior court the Department requested conclusions of law, the trial court was not required to set forth a specific reason for denying attorney fees, although it is a good practice to do so. See Associated Indemnity Corp. v. Warner, 143 Ariz. 567, 694 P.2d 1181 (1985).[5]
IV.

Did the superior court correctly allow Cortaro to recover for the cost of a transcript?
In its November 9, 1983, order, the superior court overruled the Department's objections to Cortaro's request for costs, which included $1,585.20 for a copy of the transcript of the hearing before the Department. Cortaro apparently obtained a copy of the transcript from the court reporter who reported the proceedings before the Department.
The Department contends that the transcript of the hearing is a public record which the Department is required to make available upon request, relying upon A.R.S. § 39-121.01(D)(1). It points out that regulations provide for copies at the rate of twenty cents per page, which, for the transcript at issue here, would total $134.20. The Department argues that the superior court abused its discretion in allowing Cortaro $1,585.20 for the transcript. Cortaro responds that allowance of this cost was within the discretion of the trial court under A.R.S. § 12-331.[6] We agree.
Following a hearing before the Department, the proceedings "shall be transcribed on request and at the expense of the requesting party." A.R.S. §§ 45-480(B) and 45-599(E). In the usual situation, Cortaro would have been required to pay the expense of having the transcript prepared and might then seek reimbursement as a taxable cost in the superior court. Until the transcript is prepared, there would be no official record from which Cortaro could obtain a copy at agency copy rates. From *356 the present record, it is not clear when and at whose expense the transcript was initially prepared. We hold, therefore, that it was not an abuse of discretion for the trial court to allow Cortaro the cost of its copy in the amount of $1,585.20 instead of $134.20.
V.

Should the affidavit of Stephen E. Davis be stricken from the record?
In the proceedings before the superior court, Tucson filed an affidavit of Stephen E. Davis which stated that Tucson had caused to be built a "water main extension" from an existing Tucson main to Peppertree Ranch and had started delivery of water to Peppertree through this extension as of August 25, 1983. The affidavit was filed as an attempt to show that Peppertree had become a part of Tucson's service area through this extension of service. Cortaro's motion to strike the affidavit was denied.
Cortaro argues that the trial court erred in allowing the affidavit since it was new evidence occurring 1-1/2 years after the close of the administrative record. Cortaro acknowledges that A.R.S. § 45-405(E) and A.R.S. § 12-910(A) permit new evidence in an administrative appeal, but contends that in this instance the court abused its discretion. It argues that the affidavit is irrelevant because the pipeline was not in existence when the Department entered its order. See Tucson Electric Power Co. v. Arizona Corporation Commission, 132 Ariz. 240, 645 P.2d 231 (1982) (evidence of events occurring after hearing not admissible).
Tucson contends the affidavit was appropriate under rule 403, Arizona Rules of Evidence, and that, if error exists, it was harmless. It states that the extension of a pipeline from an existing main in Tucson's service area to Peppertree renders the appeal moot because the extension of a pipeline and the delivery of water through it brings Peppertree into Tucson's service area. We express no opinion as to the validity of this legal contention.
We agree with Cortaro that the affidavit should not have been allowed since it raises issues which are foreign to the proceedings. If a pipeline exists, as Tucson contends, then in new proceedings before the Department the effect of the pipeline can be determined in the context of issues presented in that proceeding. The order denying the motion to strike the affidavit is reversed.
VI.

Should the superior court have remanded the case to the Department?
In its decision on appeal and interlocutory judgment entered on June 2, 1983, the superior court remanded the case to the Department "with instructions to cancel and revoke the three well drilling permits."
Cortaro contends that there is no reason to remand to the Department for further proceedings because the court ruled that the permits were invalid and there is nothing left to do. It points out that under A.R.S. § 12-911, the purpose of a remand is to permit further hearings and proceedings and none are necessary.
We agree with Cortaro. The order remanding the case to the Department is set aside and the superior court is directed to enter a modified judgment in which the Department's Decision and Order G-80-2, dated March 25, 1982, is vacated.
For the reasons set forth, the judgment of the superior court is affirmed in part, reversed in part, and remanded for entry of a modified judgment in accordance with this decision.
JACOBSON, C.J., and HAIRE, J., concur.
NOTES
[1] For a general review of the background and content of the Arizona code, see:

1. Connal, Jr., A History of the Arizona Groundwater Management Act, 1982 Ariz.St. L.J. 313.
2. Higdon & Thompson, The 1980 Arizona Groundwater Management Code, 1980 Ariz.St. L.J. 621.
3. Note, The Right to Use Groundwater in Arizona after Chino Valley II and Cherry v. Steiner, 25 Ariz.L.Rev. 473 (1983).
[2] All references to code sections in the text refer to the 1983 Arizona Groundwater Management Act as applied by the superior court. There have been some changes made by the legislature to the Arizona Groundwater Management Act since the beginning of this case which are noted if applicable.
[3] Now A.R.S. § 45-402(26).
[4] Subsequent to the briefing of this matter on appeal, the numbering of the subsections of § 12-348 was amended so that former (G)(1) currently is numbered as (H)(1). There has been no substantive change in the provision. For purposes of this opinion, we use the numbering in effect prior to the change.
[5] We also reject Cortaro's related argument that aside from the issue of attorney fees, the superior court failed to set forth its findings of fact and conclusions of law pursuant to A.R.S. § 12-911(C) as to the entire case. First, we note that the only request was for conclusions of law. We find that the court adequately set forth conclusions of law in its judgment in accordance with A.R.S. § 12-911(C). In addition, A.R.S. § 12-911(C) is logically relevant only to those types of administrative review in which the trial judge takes additional evidence or the proceedings involve a trial de novo pursuant to A.R.S. § 12-910(A).
[6] No contention is raised by the Department, on appeal, that A.R.S. § 12-331 is not the proper statute for the allowance of costs in this instance. A.R.S. § 12-331 allows taxation of costs in the supreme court and the court of appeals and authorizes the recovery of the cost of a transcript, whereas A.R.S. § 12-332 provides for taxation of costs in the superior court and makes no provision for the cost of a transcript. While we do not rule on this question, since it is not raised, we do note that the Arizona Appellate Handbook states, "[i]n the absence of any specification of what costs are taxable in an ARA [Administrative Review Act] review proceeding, it appears that A.R.S. § 12-332, concerning taxable costs in general in superior court, would apply." (Emphasis added) Arizona Appellate Handbook, Vol. 3, § 32.3.7.2.4. We also note that expenses not enumerated in the costs statute are not recoverable as costs. Fowler v. Great American Insurance Company, 124 Ariz. 111, 602 P.2d 492 (App. 1979); Sweis v. Chatwin, 120 Ariz. 249, 251, 585 P.2d 269, 271 (App. 1978). For purposes of this case, we assume A.R.S. § 12-331 applies.